UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | |
| Plaintiff, | |
| v. | Case No. _____ |
| QUALPAY, Inc. a Delaware Corporation. | COMPLAINT FOR PERMANENT INJUNCTION AND OTHER EQUITABLE RELIEF |
| Defendant. | |

Plaintiff, the Federal Trade Commission ("FTC"), for its Complaint alleges:

1.     The FTC brings this action under Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b), to obtain permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, and other equitable relief for Defendant's acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## SUMMARY OF THE CASE

2.     On June 4, 2018, the FTC filed a lawsuit in the Middle District of Florida against a business coaching and investment opportunity scheme called "My Online Business Education" or "MOBE." *FTC v. MOBE Ltd. et al* No. 6:18-cv-862-ORL-37DCI.  Since 2013, MOBE defrauded tens of thousands of consumers—for over $300 million—by claiming to offer a simple 21-step system that consumers could use to start an online

marketing business and generate substantial income.  Contrary to these representations, most consumers that purchased MOBE products suffered devastating financial losses.

3.      Qualpay, Inc. is an independent sales organization ("ISO") that helps merchants obtain payment processing services in order to charge consumers' credit cards. Qualpay helped MOBE open and maintain merchant accounts despite clear indications that MOBE operated a deceptive scheme that injured consumers.  From January 2017 until June 2018, Qualpay processed nearly $80 million in payments for MOBE until the FTC obtained a temporary restraining order that halted the MOBE enterprise.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345.

5.      Venue is proper in this District under 28 U.S.C. § 1391 (b)(1), (b)(2), (b)(3), (c)(1), (c)(2), (c)(3), and (d) and 15 U.S.C. § 53(b).

## PLAINTIFF

6.      The FTC is an independent agency of the United States Government created by statute.  15 U.S.C. §§ 41-58.  The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.

7.      The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act and to secure such equitable relief as may be appropriate in each case, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies.  15 U.S.C. § 53(b).

**DEFENDANT**

8.      Defendant Qualpay, Inc. ("Qualpay") is a Delaware corporation formed in October 2013, with its principal place of business at 4 West 4th Avenue, Suite 404, San Mateo California, 94402.  Qualpay transacts or has transacted business in connection with the matters alleged herein in this District and throughout the United States.

**COMMERCE**

9.      At all times material to this Complaint, Defendant has maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

**QUALPAY'S BUSINESS PRACTICES**

10.      Qualpay is an Independent Sales Organization ("ISO") that was founded in October 2013.  Qualpay acts as an intermediary to link its merchant-clients with an acquiring bank that has the ability to process sales through the credit card networks, such as Visa or Mastercard.  Qualpay is an ISO for Synovus Bank.

11.      Without access to a merchant acquiring bank that is a member of a credit card network such as Visa or Mastercard, merchants are not able to accept credit card payments from consumers.

12.      Qualpay receives payments from its merchant-clients for referring them to acquiring banks.  The payments generally consist of a percentage of every transaction that the merchant-client processes as well as a variety of flat fees, including a fee for every chargeback filed by consumers against Qualpay's merchants.

13.      Under its contractual arrangement with its acquiring bank, Synovus, Qualpay

is required to have "processes" in place to review merchant-clients for "adherence to Consumer Protection Laws and regulations that prohibit unfair or deceptive marketing activities."

14.     The contractual arrangement with Synovus requires Qualpay to screen or underwrite applications from prospective merchant-clients and to monitor the transaction activity of existing merchant-clients.

15.     Qualpay's underwriting guidelines subject different merchants to different levels of scrutiny.  Larger merchants and merchants that sell particular types of products are subject to a more thorough review.

16.     One of the primary indicators that a merchant may be engaged in fraudulent conduct is a high chargeback rate.  Chargebacks occur when customers contact their credit card issuing bank to dispute a charge appearing on their credit card account statement. Chargebacks are not the typical method for consumers to get a refund.  Ordinarily, consumers can get refunds directly from the merchant, but when a merchant does not offer a refund or makes it difficult to obtain a refund, consumers can resort to the chargeback process to dispute the charge.

17.     The credit card networks have chargeback monitoring programs designed to flag merchants with excessive chargeback rates (*i.e*., 100 or more chargebacks in one month, and a monthly chargeback-to-transaction ratio of 1% or greater).  Merchants placed in excessive chargeback programs are subject to additional scrutiny by the credit card networks, as well as possible fines and termination.

**A.     Qualpay Ignored Clear Warning Signs About MOBE.**

18.     MOBE was a fraudulent online coaching and investment opportunity scheme that operated from 2013 until June 2018 when it was sued by the Federal Trade Commission. Although headquartered in Malaysia, MOBE primarily targeted consumers in the United States using the internet, live events, telemarketing, and its network of coaches and affiliates.

19.     As evident from cursory internet searches, MOBE sold "memberships" costing tens of thousands of dollars through its "training" program and through live events using blatantly false and exaggerated earnings claims such as: "How Anyone Can Make Up To $1,000 In A Single Day Working From home In As Little as 45 Minutes A Day."  MOBE also had an "F" rating from the Better Business Bureau.

20.     MOBE routinely convinced consumers who lacked funds in their savings or retirement accounts to apply for and open new credit lines in order to pay for MOBE memberships that cost thousands or tens of thousands of dollars.  Most of these consumers did not make money through MOBE and were left with crippling credit card debt.  MOBE's income disclosures indicated that the average MOBE consumer made less than $250 a year.

21.     Qualpay's payment processing services were critical to the success of the MOBE enterprise.

22.     Before Qualpay agreed to open merchant accounts for MOBE, MOBE had a great deal of difficulty finding payment processors who would accept MOBE's business. From November 2015 through December 2016, at least seven different payment processors refused to do business with MOBE.  These payment processors turned down MOBE's applications because, among other things, MOBE had high chargebacks, MOBE had negative

online reviews, MOBE used a multi-level-marketing business structure, and MOBE used "claims of wealth creation" to sell its products.

23.     Based on its contract with Synovus, under Qualpay's underwriting guidelines, MOBE was a "High Risk" Merchant because it sold: "Business Opportunit[ies]," "Continuity Programs," "How to Businesses," "Seminar/Coaching Services," and "Subscriptions." MOBE was also a "Restricted" merchant because it sold: "Memberships," it was a "Multi-Level Marketer," it sold products through "Upselling" and it sold "Work From Home-Business Opportunit[ies]."

24.     Qualpay's underwriting guidelines required Qualpay to "vet[ ] completely" merchant applications that had even a single characteristic that was "High Risk" or "Restricted." Stacy Renz, the Vice President of Underwriting and Investigations at Qualpay, testified that the process of completely vetting a merchant would include "wanting to have a full understanding of what the merchant is doing and how they're doing it." Qualpay's CEO, Craig Gass, explained that completely vetting a merchant like MOBE would include looking at the sales, marketing practices, and websites, along with understanding every product the merchant sells, how the products are sold, and how much they cost. Notwithstanding these requirements, Qualpay opened accounts for MOBE without examining MOBE's sales and marketing practices, the numerous websites MOBE used to promote and sell its products, the nature of the products or services MOBE offered, or even their cost.

25.     On March 30, 2016, Qualpay received an inquiry from one of its sales agents, Platinum Payments, LLC ("Platinum Payments) about opening an account for MOBE. Sales agents are third-parties who refer potential merchant-clients to ISO's like Qualpay. Platinum

Payments told Qualpay that MOBE was an "international education company" with a U.S. "presence" that was looking to open a domestic merchant account.

26.     Visa and Mastercard rules require merchants to open payment processing accounts where their operations are centered.  Under these rules, foreign companies cannot open domestic payment processing accounts to charge domestic consumers, and domestic companies cannot open foreign payment processing accounts to charge foreign consumers.

27.     Qualpay's policies also prohibited Qualpay from processing for merchants located outside the United States.

28.     Qualpay asked Platinum Payments if MOBE was physically located in the United States and if MOBE's "principal/owner" was located in the United States.  Platinum Payments responded that Susan Zanghi, a "key management member" with MOBE, operated the business "virtually" out of her home address, and the application would be signed by MOBE's CEO, Matthew Lloyd McPhee, who resided abroad.  Qualpay responded that it would look for a "principal/owner" or individual who had authority to sign on behalf of MOBE who was located in the United States.

29.     Platinum Payments did not respond to Qualpay's email.  But, more than six months later, in late November and early December of 2016, Platinum Payments submitted merchant applications for various MOBE accounts.

30.     At the same time that Platinum Payments submitted these applications, Hadley Starkey, another Qualpay sales agent, submitted applications for MOBE.  Starkey and Platinum Payments did not know that MOBE was working with multiple sales agents or that they were both submitting accounts to Qualpay at the same time.

31.     The Platinum Payments and Starkey applications contained significant discrepancies.  For example, the application submitted by Starkey requested a single account that would process a projected $56 million in annual sales.   The applications submitted by Platinum Payments requested multiple accounts that would process a total of $5 million in annual sales.  This large discrepancy should have been a red flag for Qualpay.

32.     Merchant chargeback rates are sometimes calculated on a per-account basis. A merchant's chargebacks are deemed excessive based on both a ratio and count of chargebacks (typically 1% and 100 chargebacks per month).  A merchant with ten accounts, for example, could potentially accrue ten times the number of chargebacks before suffering the consequences of having "excessive" chargebacks.

33.     Also, Qualpay's underwriting guidelines require more thorough reviews of larger merchants.  A merchant artificially underestimating its potential processing volume could be an indication that the merchant is trying to avoid a thorough underwriting.

34.     The application materials submitted by Starkey also stated that the MOBE corporate entity submitting the applications, MOBEProcessing.com Inc., had a business address in Delaware, a mailing address at a townhouse in North Carolina, and a DBA called "MOBE" whose company headquarters were located in Malaysia.

35.     In contrast, the application materials submitted by Platinum Payments for MOBEProcessing.com Inc. did not mention a business address in Delaware and claimed that MOBE, the DBA of MOBEProcessing.com Inc., was located in North Carolina, and not in Malaysia.

36.     On December 2, 2016, Qualpay decided to "continue moving forward" with the application submitted by Platinum Payments.

37.     Over the next month, Qualpay underwrote and eventually approved the MOBE accounts.  During this time, Qualpay's underwriters asked a few follow-up questions about MOBE's applications.

38.     First, the underwriters asked about MOBE's actual location.  The underwriters pointed out that the applications appeared to list the signer's home address in North Carolina as MOBE's business location, but the materials also indicated there were 18 in-house customer service representatives.  Qualpay's underwriters asked for "the address whereby business is being conducted" and not just the legal address.

39.     In response to these questions, MOBE explained that Susan Zanghi was the only person who worked at the North Carolina address listed on the application, that the 18 in-house customer service representatives worked "out of our Malaysia office," and that MOBE employed event staff who worked virtually.  MOBE also submitted a letter from its CEO, McPhee, authorizing Susan Zanghi "to act as a financial representative for MOBE Processing.com, Inc. in the United States of America."

40.     Qualpay's underwriters did not ask why MOBE's application materials included several months of processing statements from a payment processor in Mauritius, or why the Platinum Payments applications differed from the Hadley Starkey applications on objective facts about the same merchant.

41.     During the course of Qualpay's interactions with MOBE, Qualpay learned that MOBE's CEO, CFO, and CTO were located abroad, and that Susan Zanghi signed her emails with the title "Executive Assistant."

42.     Qualpay's underwriters also asked for documents that showed how the various aspects of MOBE's business were intertwined.  In response, MOBE provided a "product map" in which MOBE requested 5 different merchant accounts.  The first account would sell a $49 online product, and several supplemental products known as "upsells" that cost $2,500, $9,997, $16,667, and $29,997.  The second account would sell a "Seminar" for $49, a "3-Day Business Summit" upsell for $497, and workshops that cost $10,000, $25,000, $50,000 and $100,000.  The other three accounts were for the "MOBE Marketplace," "MOBE Traffic," and "Partner Products."

43.     After receiving the product map, Qualpay decided to structure MOBE's processing through seven merchant accounts instead of the five that MOBE had requested.  Qualpay's corporate representative testified that Qualpay had a policy of requiring merchants to use a separate merchant account for each product type that the merchant offered.

44.     Qualpay did not, however, require MOBE to separate each of its product types into different merchant accounts.  For example, consumers who purchased a $49 online product through MOBE Online were pitched four separate upsells.  Under Qualpay's merchant account structure, the first upsell would be sold in the same merchant account as the initial product and the next three would be sold through a separate account.

45.     Following Qualpay's instruction, MOBE submitted seven merchant applications.

**B.      Qualpay Failed to Follow its Own Policies and Procedures when Underwriting MOBE's Accounts**

46.      Qualpay failed to follow its own policies and procedures for underwriting merchant accounts when it underwrote the applications MOBE submitted.

47.      First, Qualpay did not require MOBE to submit its processing statements for the three most recent months.  Reviewing a merchant's recent processing statements is important from an underwriting perspective because it shows how a merchant's accounts are performing and whether they are generating excessive refunds or chargebacks.  Stacy Renz testified that there are no exceptions to Qualpay's requirement that qualifying merchants provide their most recent three months' processing statements.

48.      When Qualpay reviewed MOBE's merchant applications in January 2017, MOBE provided processing statements from July 2014 to January 2015.  Those processing statements showed an average transaction of $418 and an average chargeback rate of 1.76%.  Qualpay did not ask MOBE for more recent processing statements or inquire why the processing statements MOBE provided showed a chargeback rate in excess of the levels that would subject MOBE to fines from the credit card networks.

49.      Qualpay also did not ask MOBE whether the processing statements MOBE had provided reflected sales of all of MOBE's products.  The processing statements showed an average transaction of $418 and two of the accounts that MOBE had applied for sold products that cost a minimum of $10,000.

50.      Second, Qualpay did not ask for sales scripts for the MOBE accounts that involved telemarketing sales.  Renz testified that when merchants sell products over the telephone, Qualpay requires the merchant to submit a sales script so that Qualpay can assess

"what is being discussed with a consumer" and "how is the merchant disclosing to the consumer what they're signing up for."  Renz said that if a merchant told Qualpay it did not use scripts, Qualpay would not accept that explanation.

51.     The applications submitted for the Coaching/Mentoring, Mastermind, Online Product Group, and Traffic accounts all indicated that the accounts sold products, in part, through telemarketing.  These accounts comprised $76.5 million of the $80 million Qualpay would process for MOBE.  Qualpay approved these accounts without asking for or receiving telemarketing scripts to review.

52.     Third, Qualpay did not make any efforts to understand how MOBE sold products at live events.  The Coaching/Mentoring, Home Business Summit, Mastermind, Online Product Group, and Summit accounts all indicated that they sold products, in part, at live events.  Qualpay's corporate representative testified that underwriting a "high risk" merchant account, like the MOBE accounts, required a review and assessment of the claims the merchant made in selling its products.  When underwriting the MOBE accounts that sold products at live events, Qualpay did not ask for or review any scripts or presentations to assess the claims that MOBE made at live events.

53.     Stacy Renz also explained that when Qualpay underwrote merchant accounts that involved selling products at live events, Qualpay would review the marketing materials that were used to promote the events.  The merchant applications for the five MOBE accounts that sold products through live events stated that the live events were promoted through "affiliate emails, direct mail, Facebook advertisements and YouTube videos."

Qualpay did not ask for or review any of these marketing materials when it underwrote these accounts.

54.     In underwriting these five accounts, Qualpay did review a total of three handouts that MOBE used at the live events to promote its products.  In one pamphlet, Matt Lloyd was quoted as saying he was looking for clients "Who want to launch their online business to 7-figures and beyond."  Another pamphlet claimed, "[Y]our MOBE Mentor will work with you 1-on-1 to create and launch your own product and sales funnel. . . that can generate hundreds of thousands of dollars per year for your business for many years to come."  The third pamphlet advertised the ability to "bring you tens (even hundreds) of thousands of dollars on autopilot."  Qualpay did not ask MOBE to substantiate or remove the claims made in these handouts.

55.     Fourth, Qualpay's policies prohibited Qualpay from opening merchant accounts for "Aggregators / Third Party Service Providers."  As a general rule, merchant accounts can only be used to process transactions between a consumer and the entity that opens the account.  By contrast, "Aggregators / Third Party Service Providers" (also known as payment facilitators) use a single merchant account to aggregate transactions on behalf of multiple merchants.  For example, if a company providing medical billing software to doctors' offices was also operating as a registered payment facilitator, then that company could process credit card sales that are made between doctors' offices and their patients.

56.     The use of payment facilitators decreases transparency in the payment system because acquiring banks and the card networks do not know the individual merchants under each payment facilitator.  Therefore, only payment facilitators registered with the card

associations and with express permission are permitted to aggregate transactions on behalf of other merchants.  Because Qualpay's policies prohibited Qualpay from opening accounts for payment facilitators, Qualpay was prohibited from opening accounts for merchants that processed sales for third-parties.

57.     Two of the MOBE applications indicated that the merchant accounts would be used to process sales that third-parties made of their own products.  MOBE told Qualpay that the Summit account would be "used to sell affiliate partner packages at MOBE events," and that the Marketplace account would be "used to sell digital education products."  The MOBE Marketplace website indicated that the marketplace was a service MOBE offered by which its 12,000 affiliates could sell their own independent products and MOBE would provide payment processing services.

58.     Qualpay approved these account applications without asking MOBE whether the products sold through the accounts were third-party products, what the products were, how much they cost, or how they were sold.

### C.  Qualpay Agreed to Open the MOBE Accounts Subject to Certain Conditions.

59.     On January 5, 2017, Qualpay agreed to open seven payment processing accounts for MOBE.  Qualpay required MOBE to agree to certain conditions for opening the accounts.  Qualpay conveyed these conditions to MOBE in a written letter that MOBE counter-signed.

60.     First, Qualpay required MOBE to keep its total number of chargebacks for each account below 75 per month, and maintain a chargeback rate below 0.75%.  Qualpay also required MOBE to enroll with Chargeback Defense Solutions ("Chargeback Defense")

for "full services."

61.     Chargeback Defense is one of several companies that offer chargeback prevention services.  MOBE worked with Chargeback Defense and later, ETHOCA, another provider of chargeback prevention services.  Typically, when a consumer files a chargeback with the consumer's bank (known as an issuing bank), the issuing bank alerts the credit card network, the credit card network alerts the merchant's bank (known as an acquiring bank), and the acquiring bank alerts the merchant.  Credit card networks keep track of the number of chargebacks a merchant accrues.  Merchants with excessive chargebacks are subject to fines and termination.

62.     Some issuing banks have agreements with chargeback prevention companies so that after a consumer files a chargeback, the issuing bank will wait 24 to 72 hours before notifying the credit card networks of the chargeback.  If, during that time, the merchant refunds the consumer, then the issuing bank will consider the matter resolved and will not forward the chargeback to the credit card networks.

63.     From the issuing bank's perspective, these arrangements can have the benefit of getting consumers their money faster and with fewer risks than if a chargeback is filed.

64.     From the merchant's perspective, this arrangement offers the merchant the opportunity to avoid a chargeback being counted for purposes of calculating the merchant's chargeback rate.

65.     During the course of its business relationship with MOBE, Chargeback Defense alerted MOBE to 1,659 chargebacks, 1,200 of which were prevented from becoming chargebacks because MOBE issued the consumers refunds.

66.     When Qualpay assessed whether the MOBE accounts were engaged in fraudulent activity, the primary indicator Qualpay used was MOBE's chargeback rates. Qualpay knew that the chargeback rates it was assessing were artificially lowered by Chargeback Defense, but Qualpay did not attempt to review the actual number of chargebacks filed by consumers.

67.     Qualpay earned referral fees for referring merchants to Chargeback Defense.

68.     The second condition Qualpay placed on the MOBE merchant account is that Qualpay put the MOBE Online account on "100% reserve."  The MOBE Online account primarily processed sales of the $49 MOBE product that MOBE members purchased first. According to the January 5, 2017 letter from Qualpay to MOBE conditionally opening the account, "there was evidence of deceptive marketing and merchant will need to adjust website."

69.     Payment processors maintain a "merchant reserve" that contains some of the money processed through a merchant's account.  If a merchant goes out of business, the payment processor may use the money in the merchant reserve to cover a variety of expenses.  By placing MOBE Online on 100% reserve, Qualpay would, at least temporarily, keep 100% of the money MOBE Online charged consumers rather than transferring the money to the merchant.

70.     When Stacy Renz, the Vice President of Underwriting and Investigations reviewed one of the websites associated with the MOBE Online account, she identified claims that she viewed as evidence of deceptive marketing.  The website contained a headline: "How a Shy, 22-Year Old Farm Boy 'Cracked the Code' to Making $15,200 Per

Sale Online… And Went on to Make $51,373,000 In The Next 5 Years Using This 'Big Paydays' System *(That you Can Easily Copy)*."  (emphasis in original).  The website also showed several pictures of individuals who had purportedly made more than $1 million through the system.

71.     Qualpay knew that both MOBE Online and MOBE Home Business Summit were used to process sales of the initial MOBE product to consumers.  Although Qualpay concluded that MOBE Online marketed its product deceptively, Qualpay's underwriting of the Home Business Summit account did not include a review of websites, sales presentations, sales scripts, or other materials that would allow Qualpay to assess whether MOBE Home Business Summit also marketed its products deceptively.  If Qualpay had undertaken this review, it would have found additional "deceptive marketing."  For example, the website MOBE used to promote the Home Business Summit claimed, "You will leave this event knowing exactly what you need to do to make $100,000 in the next 12 months using the internet."

72.     Qualpay also knew that the MOBE Mastermind and the MOBE Coaching/Mentoring accounts processed the sale of additional and much more expensive upsells to consumers who had purchased from MOBE Online and MOBE Home Business Summit.  However, Qualpay did not ask MOBE how it was able to market the $29,997 Diamond Mastermind or the $100,000 coaching workshop without using deception even though Qualpay knew that MOBE was using deception to sell its $49 product through the MOBE Online account.

D.     **The MOBE Accounts' Processing Data Immediately Alerted Qualpay to Substantial Problems with MOBE's Business Practices.**

73.     After the MOBE accounts were opened in January 2017, the accounts' processing activity immediately raised further red flags about MOBE's business model.

74.     Within the first two months after Qualpay opened the MOBE accounts, MOBE greatly exceeded its approved processing volumes and accrued significant chargebacks.

75.     The MOBE Online account was approved to process $17,000 in consumer payments per month, and it processed $154,000 in January and $768,000 in February.

76.     The MOBE Home Business Summit account was approved to process $17,000 per month, and it processed $48,500 in January and $151,000 in February.

77.     On February 23, 2017, in an email to other Qualpay employees, Stacy Renz speculated that the sales agent, Platinum Payments, had intentionally understated the likely processing on the accounts in order to reduce the level of underwriting to which the accounts would be subject.

78.     On February 16, 2017, Discover notified Synovus bank that Discover had "identified fraudulent activity" associated with 30 of the 155 transactions run through the MOBE Online account.  Discover asked Synovus to investigate the merchant and determine whether the merchant was engaged in fraud or a victim of fraud.  If the merchant was engaged in fraud, Discover asked Synovus to "terminate" the merchant and "any related merchants."  Abigail Helms at Synovus forwarded the notification to Terri Bunnis, a Senior Business Analyst at Qualpay, and Stephen Prince, Qualpay's Executive Vice President of Operations.  Qualpay's Risk Manager, Cliff Lanier, later reported to Synovus that Qualpay

had "formulated a plan" to address the fraud.  Qualpay's plan was consistent with a

conclusion that MOBE had been a victim of fraud.  It included steps such as MOBE asking

customers to provide the CVV2 information listed on the back of their credit cards.

79.     On February 28, 2017 Terri Bunnis emailed Cliff Lanier a summary of

MOBE's activity up to that point in time.  Bunnis noted that MOBE had processed

$1,387,000 more in February than it had been approved for, its chargeback ratios were over

1%, and that a review of the chargebacks submitted by consumers indicated that they were

"mostly fraud."

80.     Bunnis proposed a "best practices discussion" directly with the merchant so

that Qualpay could ensure that "this is 'normal' for that product and volume."

81.     On March 1, 2017, Qualpay shared its concerns with MOBE, and Qualpay

and MOBE came up with a "plan" to address Qualpay's concerns.  Qualpay asked MOBE to

provide updated financials that would support the increased volume.  Qualpay also asked for

"clarification" from MOBE about each product that was being processed through each

account.

82.     Qualpay and MOBE agreed to address MOBE's chargeback ratios by having

"constant communication" between Qualpay's risk team and Chargeback Defense to make

sure that the proper tools were in place to "effectively use the alerts to mitigate future

chargebacks."

83.     The "plan" did not address the fact that MOBE was still selling products

through a website that, according to the conditions Qualpay placed on MOBE Online when it

opened the account, showed "evidence of deceptive marketing."

84.     By March 2017, Stacy Renz, the head of Qualpay's underwriting department, recommended that Qualpay suspend processing for the MOBE accounts until Qualpay could "figure out everything that was going on."  Renz did not believe that Qualpay's underwriting of MOBE was sufficient for Qualpay to understand MOBE's business.  Renz made this recommendation to her superiors on multiple occasions.

85.     Tina Steffen, who worked in Qualpay's "Lead Risk Analysis" division and was responsible for monitoring the performance of the MOBE accounts, shared Renz's concerns.  Steffen recommended terminating the MOBE relationship altogether.

86.     After reviewing MOBE's chargeback data with Terri Bunnis, Steffen agreed that Qualpay should work with MOBE to see if it could rehabilitate the accounts.  The chargeback data Steffen reviewed did not include chargebacks that had been prevented by Chargeback Defense.

87.     Stacy Renz, however, continued to believe that Qualpay lacked a sufficient understanding of MOBE's business to continue to process for MOBE.  Renz continued to believe this until the MOBE accounts were terminated after the FTC's lawsuit against MOBE.

88.     On March 13, 2017, Cliff Lanier circulated updated MOBE numbers showing that for the first part of March, MOBE had processed $1,343,000 although it was approved to process only $418,000, and MOBE's chargeback ratio had increased to 2.18%.

89.     On March 14, 2017, Qualpay asked MOBE for updated financials and for more information about MOBE's products.

90.     On March 21, 2017, MOBE submitted updated bank statements for MOBEProcessing.com, Inc., the entity in whose name the seven merchant accounts were opened.

91.     Qualpay processed an average of $3,618,940 per month for MOBEProcessing.com Inc. from January through March 2017.  Yet MOBEProcessing.Com, Inc.'s bank statements from December 2016 through February 2017 showed an average balance of $40,000 in its checking account and an average balance of $7,697 in its savings account.

92.     MOBE also submitted balance sheets and profit and loss statements for MOBE Ltd., though it did not submit those statements for MOBEProccessing.com.

93.     In a March 22, 2017 email, Tina Steffen called the statements "Kind of comical, if you want a good laugh today."  In another email that day, Steffen also wrote that MOBE was "playing us," and Stacy Renz wrote, "Agreed."

94.     By the end of March 2017, Qualpay had processed more than $6 million for MOBE through accounts that were approved to process $1,250,000.

95.      In the aggregate, the MOBE accounts had 452 chargebacks, and a chargeback rate of 2.54%,—excluding chargebacks that were prevented by Chargeback Defense.

96.     MOBE Online was the subject of a Mastercard Merchant Online Status Tracking ("MOST") report because in March 2017, the account had 5 or more fraud transactions and a fraud to sales ratio that was greater than 8%.  Visa also added the account to its chargeback monitoring program because the account had over 100 chargebacks and a chargeback ratio that exceeded 1%.

97.     On March 24, 2017 the St. Louis Better Business Bureau ("BBB") warned consumers that MOBE had mailed invitations to consumers in the St. Louis area advertising a seminar that would teach consumers "How to Create a Full-Time Income in Your Spare Time," and "gain freedom from the 9 to 5 rat race while potentially making $5,000 to $10,000 (or more) per month."  The BBB warned consumers that MOBE had an "F" rating, and that the "income disclosure" on MOBE's website mentioned that the average MOBE member "generates less than $250 per year."

98.     On March 31, 2017, Terri Bunnis told Craig Gass that she expected MOBE Online to hit Visa's chargeback monitoring program for March and that Qualpay was "working on a multi-approach plan" to address the MOBE accounts.

99.     On April 6, 2017, Qualpay and MOBE had a call that resulted in Qualpay taking the MOBE accounts off 100% reserve and agreeing to release $2 million of the $3.5 million reserve Qualpay was holding.

100.    Cliff Lanier explained that that there had been "allot of co-operation" (sic) including MOBE agreeing to "fix[] the underwriting condition regarding the website."

101.    Qualpay still did not require MOBE to remove the deceptive content from its website before releasing $2 million to MOBE.

**E.  The Accounts Continued to Perform Poorly through June when Qualpay Decided to Terminate Two of MOBE's Accounts While Keeping the Other Five Open.**

102.    In early April 2017, MOBE followed up with Qualpay about removing the deceptive content from the MOBE Online website.  The MOBE Online account had processed nearly $2,300,000 by this point.

103.    On April 5, 2017, Susan Zanghi asked for clarification about the changes that needed to be made to MOBE's website.  Stacy Renz told Zenghi that "deceptive marketing is a grey area" and she advised, "I am not saying that you need to remove all of the testimonials [from the website], however, I would ask that they remove the majority of them."

104.    On April 8, 2017, Zanghi told Qualpay that they had revised "the Big Paydays – video" and she submitted the video to Qualpay for approval.

105.    On April 10, 2017, Meghan Hyde, a Qualpay underwriter realized that the website Zanghi had submitted for approval was different from the website that was underwritten, and the website that was underwritten no longer existed.

106.    Hyde also determined that the "big paydays video" still contained 18 testimonials and that, although MOBE had "moved things around," all of the deceptive content was still present.

107.    That same day, Visa added MOBE Online to its Fraud Monitoring Program because the account had a fraud to sales amount ratio of 12.25%.  Terri Bunnis alerted Craig Gass that MOBE Online had been placed on the Fraud Monitoring Program and that she expected it to be placed on Visa's Chargeback Monitoring Program as well.

108.    On April 14, 2017, Qualpay's underwriter, Megan Hyde, signed up for a MOBE mailing list through the website mttbsystem.com/big-pay-days.  In the welcome message she received, Matt Lloyd mentioned that he was "running an international operation with over 20 full time employees."  The email listed the company's address in Malaysia.

109.    On April 14, 2017, Abigail Helms, Synovus Bank's ISO Risk Manager, emailed several Qualpay employees—including Terri Bunnis and Craig Gass—to share

concerns about the MOBE accounts.  Helms explained that "the business model for these

types of merchants pose a high reputational risk and it appears that [MOBE] is having issues

that are concerning for Synovus."  Helms also noted that it was odd that MOBE's accounts

would hit the transaction monitoring programs so quickly.

110.    That day, Craig Gass and Terri Bunnis participated in a call to discuss the

MOBE accounts.  Bunnis responded to Helms that MOBE had not had any problems with its

prior Australian processing.  He also explained that Qualpay had had a "series of meetings"

with MOBE and that if the accounts were not "showing marked improvement by the end of

April, Qualpay will re-assess our ability to continue the relationship with MOBE."

111.    The MOBE accounts did not show improvement by the end of April, but

Qualpay did not re-assess its ability to continue the relationship with MOBE at that time.

112.    On April 17, 2017, Abigail Helms replied to Bunnis' email and she copied

Gass and other Qualpay employees.  Helms explained that she was "concerned that the

merchant was processing in Australia and now is with us in the US."  Helms asked if the

merchant is "US Owned" because Synovus' membership in the credit card networks only

allows Synovus to process "for merchants located in the US."  Synovus could not process

"cross border transactions: merchants located outside the US processing through a US

acquirer or vice versa."  Bunnis responded that the "MOBE business Qualpay is processing

for is US owned and located in the US."

113.    On April 24, 2017, Stacy Renz sent Cliff Lanier a link to the website where

"supposedly" the MOBE Online purchases were generated.  Renz also acknowledged that

she was "very concerned with what I'm seeing. . . as it would appear they have multiple

websites here transactions *could* be coming from."  (emphasis in original).

114.    Renz testified that Qualpay's policy was that each merchant account should only sell products through one website.  Qualpay also had a policy of completing a website review checklist of every website associated with a merchant to verify the content of the website.  Qualpay did not follow either policy with respect to MOBE.

115.    On May 1, 2017, Stacy Renz asked MOBE's CFO if he could "walk us through the entire [sales] process from start to finish" so that Qualpay could "better understand the way your card holders walk through a single transaction for a sale."  Renz also asked for a "reconciliation of each Merchant ID as to what the actual transactions amounts are for each account so that we can get these scored correctly and have the accounts monitored accordingly."

116.    On May 3, 2017, Abigail Helms told Terri Bunnis that Mastercard had issued a "MOST" report for MOBE Home Business Summit because the account had five or more fraud transactions and a fraud to sales rate of 8% in one month.

117.    On May 5, 2017, Visa added MOBE Online to its Fraud Monitoring Program because the account had a 23% fraud to sales ratio.  A 1% fraud to sales ratio would have qualified MOBE Online for inclusion in this program.

118.    On May 9, 2017, MOBE demonstrated a sales transaction to several Qualpay employees.  Following the call, MOBE sent Qualpay a sample order form that included a product called "10K in 10 Days Big Pay Days."

119.    Tina Steffen later testified that, from a risk standpoint, the name "10K in 10 Days Big Pay Days" was problematic and MOBE would "need to change it," but Qualpay

did not ask MOBE any follow-up questions regarding the "10K in 10 Days Big Pay Days" product or ask MOBE to change the name of the product.

120.    On May 27, 2017, Cliff Lanier asked Tina Steffen for his "to do list" following the call with MOBE earlier in the month.  Steffen reminded him that the "deceptive ads on the websites needed [to be] removed on all sites."

121.    On May 31, 2017, and again on June 1, 2017, Tina Steffen asked MOBE for an update because MOBE still had not provided information about the number of websites it used, confirmation that it had removed the deceptive content from its websites, or verification regarding which sales were being processed through which account.

122.    On June 1, 2017, MOBE Provided Steffen with an Excel file which showed that MOBE had registered 347 different websites in connection with its business operations, 24 of which had sold products whose payments were processed by Qualpay.  Steffen testified that she was concerned to learn that MOBE had so many websites because Qualpay's policy was that each merchant account should only process sales through a single website, and a merchant using multiple websites "can be an indication. . . they were selling other things on the side that we didn't know about" as well as an indication that a merchant may be engaged in deceptive practices.

123.    In response to the June 1, 2017 email Steffen reviewed the 24 websites that indicated they sold products whose payments were processed by Qualpay.  Steffen said that she did not review all 300 websites because "we don't have the bandwidth for me to do that." The websites Steffen claimed to have reviewed in June 2017 included the following headlines:

- "Discover How a War Veteran Uncovered the Secret to Earning Up to $3,300/day From his Sweat-box Living Quarters in Afghanistan. Copy his secret and you can too. It's much easier than you think. We are confident anyone can make money using this powerful system."

- "We Guarantee You Will Make At Least $500 And Discover… How Anyone Can Make Up To $1,000 In A Single Day Working From home In As Little as 45 Minutes A Day."

- "If You Have Less Than $1 Million For Your Retirement, We Can Help!... We Can Create Your Dream Retirement Lifestyle in 12 Months."

- "How to Make More Money in 30 Minutes A Day Than Most People Make Working Full Time."

- "How to Make 6-Figures in Your First Year with Top Tier!"

124.    Qualpay did not discuss with MOBE the claims that were made on these websites.

125.    Steffen also said that Stacy Renz in the underwriting department would have contacted MOBE to ask why it had so many websites in the first place. In August 2019, when showed the list of websites that MOBE had provided Qualpay in June 2017, Stacy Renz laughed, said she was seeing the list for the first time, and stated she did not know that MOBE had so many websites.

126.    On June 7, 2017, MOBE Online hit the Visa Chargeback Monitoring program with 150 chargebacks and a 3.38% chargeback ratio.

127.    A week later, Qualpay told Synovus that half of Qualpay's total chargebacks across Qualpay's entire portfolio came from MOBE and one other relationship.

128.    On June 23, 2017, Qualpay decided to close two of the MOBE accounts, MOBE Online and MOBE Home Business Summit. In an email to Craig Gass and other Qualpay employees, Cliff Lanier explained, "we have had no appreciable difference in

[chargeback activity] and are now in our third month of the Visa Chargeback Monitoring Program." Despite closing two accounts, Qualpay continued to process for MOBE "upsells" generated from the accounts and other related products. Craig Gass approved the decision to keep the other five accounts open.

### F. Qualpay Decided Not to Place MOBE on MATCH.

129. When a payment processor terminates a merchant relationship due to high chargebacks, Mastercard requires the processor to place the merchant on the "Mastercard Alert to Control High-Risk Merchants" list ("MATCH"). Many payment processors, including Qualpay, have underwriting guidelines that prohibit the payment processor from processing for merchants who are on the MATCH list.

130. On June 27, 2017, Stacy Renz told Tina Steffen that Qualpay had been having discussions about placing the MOBE accounts on MATCH. Renz told Steffen that she was concerned Qualpay's CEO, Craig Gass, "will just tell us to hold off for another month or two as he's wanting to keep the revenue from these accounts on the books until we can replace it… which between you and I, is NOT the right thing to do if we were truly to follow the regs on placing a merchant on MATCH" (emphasis in original). Tina Steffen agreed that this course of action "[wa]s NOT Right!" (emphasis in original).

131. On July 14, 2017, Qualpay decided not to put MOBE on the MATCH list at all. Loriann Ouimet, Qualpay's Director of Risk Strategy emailed Craig Gass and explained that the Mastercard regulations for putting merchants on MATCH only speak to situations where the payment processor terminates "the relationship." Ouimet reasoned that because Qualpay was terminating some of MOBE's accounts while keeping others open, "it would

not fall within this definition." Ouimet explained:

> There is an argument for the grey area in that MATCH is a warning to other
> acquirers if we are terminating line of business.  However, we have actual notice
> that the merchant is going to an international processor for the terminated MIDs.
> I think that supports the reasonable, good faith decision not to place a merchant
> on MATCH for chargebacks which are being managed and watched.

132.    MOBE "going to an international processor for the terminated MIDs" was
itself a violation of Visa and Mastercard regulations and a reason to terminate the MOBE
accounts.  Under Visa and Mastercard regulations, MOBE either qualified for domestic
payment processing accounts or international payment processing accounts.  Under these
regulations, Qualpay should not have continued to process for MOBE after MOBE switched
from using domestic accounts to international accounts to process payments for domestic
consumers.  This is particularly true when MOBE was using the international accounts to
process the sale of initial products and domestic accounts to process the sale of supplemental
products to the same domestic consumers.

133.    On November 16, 2017, Qualpay received an email from a sales agent, Card
Max Payments, asking if Qualpay would be interested in opening domestic merchant
accounts for a "new opportunity" called MOBE.  The sales agent explained that MOBE was
"doing big volume so I figured it was worth a shot to see if we can work with them as there is
an opportunity for big revenues."  Even when Qualpay learned that that the factual basis for
its "reasonable, good faith decision" to keep MOBE off MATCH was no longer true because
MOBE was seeking domestic accounts, Qualpay still refrained from placing MOBE on
MATCH and continued to process payments for MOBE.

134.    Between November 2017 and June 2018, when the FTC filed its lawsuit,

Qualpay processed nearly $35 million in consumer card payments for MOBE.

**G.  Qualpay Continued to Process for MOBE Despite Clear Indications of MOBE's Illegal Conduct.**

135.    After Qualpay closed two of the seven MOBE Accounts, on July 5, 2017, Craig Gass asked Terri Bunnis to re-underwrite the remaining MOBE accounts "at least to confirm ownership, products, sales practices and volumes."

136.    Stacy Renz testified that re-underwriting the accounts was a high priority, but Qualpay did not finish the re-underwriting process before the MOBE accounts were terminated nearly a year later in June 2018, following the FTC's lawsuit.

137.    On July 17, 2017, Cliff Lanier asked MOBE to provide a list of websites for "the two [merchant accounts] that are web based," and on July 18, MOBE provided Qualpay with a list of three websites: wesellgoodtraffic.com, wesellclicks.com, and mobemarketplace.com.  On July 20, Qualpay's underwriting team approved the websites.

138.    Qualpay knew that MOBE had previously identified hundreds of websites it used as part of its business, but Qualpay did not ask MOBE whether any of these websites would be used with the remaining accounts.  Qualpay also did not ask MOBE to provide any assurances that the five accounts would make sales using non-deceptive means when Qualpay believed that the MOBE Online account marketed through deceptive websites.

139.    On August 15, Loriann Ouimet provided Craig Gass a memo titled "MOBE Timeline and Observations."  In the memo, Ouimet described Stacy Renz as reporting, "They have multiple URLs and we have no idea which go to which MID.  We cannot monitor their business and have no idea what is going on."

140.    At this time, MOBE was having trouble finding other payment processors to

open accounts to replace the volume of the closed Qualpay accounts. On July 10, 2018,

Platinum Payments said that it was "officially out of ideas" after 5 different payment

processors had refused the accounts.  As Platinum Payments explained in an internal e-mail:

> With them having an over 6% CB ratio on the two accounts that are being closed (that 6% is about 300 CB per month).  The only possible way to take this somewhere else is to present it as new which is not a huge issue but is presenting with a couple of problems.  The other issue is that the sole owner on the account is an AU citizen who lives in Malaysia.  Susan is listed as a signer on the account, but because she holds no actual ownership in the company I am having trouble getting it accepted.

141.    On August 28, 2017, Susan Zanghi asked Tina Steffen if MOBE could run

some of the products that had been sold through the MOBE Online account through the

MOBE Summit account.  Zanghi explained that the problems with MOBE Online were

primarily generated by the "$49 front end offer" and she was asking for permission to sell the

$2,497 Silver package.

142.    Qualpay then reviewed MOBE's sale of the silver package and determined

that from February 2017 through July 2017, MOBE sold nearly $3 million worth of silver

packages and the products had a chargeback rate of 12.76%.  On September 11, Tina Steffen

told Zanghi that Qualpay would not allow MOBE to run silver sales through Qualpay.

Steffen also warned MOBE that "as you probably know a couple of the accounts with us are

on the edge teetering serious chargeback issues" (sic).

143.    On October 5, 2017, Steffen emailed Zanghi because the MOBE Summit

account was processing "a lot of different price points" and chargebacks were rising on the

account.  Steffen asked if MOBE was running the same transactions through MOBE Summit

that had been sent through the closed account.

144.    The next day, Steffen wrote that Qualpay was "trying to figure out how to stop [MOBE] from sending transactions derived from the ONLINE PRODUCT GROUP and HOME BUSINESS SUMMIT pieces of their business to the SUMMIT MID."

145.    On October 27, 2017, Susan Zanghi asked for Qualpay to release additional reserve funds Qualpay was holding for MOBE.  Zanghi acknowledged that "there were some front end offer ($49) sales run through this account in error" but Zanghi "assure[d] Qualpay that we have removed access to any Qualpay MIDs for all these offers."

146.    Two days later, Rory O'Reilly, Qualpay's Executive Vice President of Profitability, emailed Tina Steffen to let her know that more $49 transactions had "popped up" on MOBE's accounts.  Rory commented that MOBE "seemed to stop the volume when we point it out" but he did not "want to play whack a mole."  O'Reilly also mentioned that MOBE was Qualpay's "largest volume customer."  Steffen responded in part, "OMG!!!! What the heck are they doing??"

147.    On November 2, 2017, Qualpay released $2,641,353.97 to MOBE out of the reserve fund.  Later that month Qualpay received notice that Mastercard issued a MOST report because MOBE Marketplace had excessive fraudulent transactions.

148.    On December 4, 2017, Qualpay and MOBE had a call regarding Qualpay's accounts.  Following the call, Tolga Suatac at MOBE emailed Tina Steffen and Stacy Renz a summary of the call.  Suatac told Qualpay that MOBE had changed its chargeback prevention company from Chargeback Defense to ETHOCA.  He said that MOBE would be staffing its chargeback department 24 hours a day, that it would check chargeback notifications every two hours, and that it would immediately refund all chargebacks up to

$497.  Sutac's summary did not indicate that Qualpay had asked MOBE to change any of its marketing practices.

149.    From January 2018 to May 2018, ETHOCA alerted MOBE to 2,664 consumer chargebacks.  ETHOCA does not maintain records indicating how many of these chargebacks resulted in refunds or how many were for Qualpay accounts.

150.    On January 7, 2018, MOBE's Tolga Suatec sent Qualpay a previously promised list of all products and price points that were being offered through MOBE's accounts.  Suatec listed several websites that were not disclosed in July as part of the re-underwriting.

151.    On February 20, 2018 Qualpay received an alert from the Merchant Acquirers Committee regarding the FTC's lawsuit against a company called Digital Altitude.  The alert explained that the FTC had sued Digital Altitude for falsely representing to consumers that they could earn money by purchasing coaching programs from Digital Altitude.  The alert also mentioned that in August 2016, MOBE sued Digital Altitude for stealing MOBE's training program and recruiting MOBE members to join Digital Altitude.

152.    Stacy Renz forwarded the alert to several Qualpay employees and commented, "Wow… many of our merchants and business coming in the door ride a VERY fine line of being viewed just like this Merchant.  We need to continue to be diligent in making sure there are no outrageous or extensive earnings claims!"  Renz also asked if the "'Mobe' mentioned in this article is our MOBE Merchant."

153.    Steffen replied that she thought it was the same MOBE and she had a meeting set up with MOBE the following day.  Steffen testified that reading the article gave her

concerns that MOBE may be engaged in deceptive business practices.  Steffen did not remember the details of her call with MOBE to discuss the article.

154.    On June 4, 2018, the FTC filed a lawsuit against MOBE, and on June 6, 2018, the Honorable Roy B. Dalton of this district court issued a temporary restraining order, including an asset freeze and the appointment of a receiver.  Thereafter, MOBE's business operations effectively ceased.

155.    In 2017, MOBE accounted for 8.3% of Qualpay's total processing volume.

156.    Qualpay provided payment processing services for several other companies that were sued by the FTC for making deceptive earnings claims in order to sell bogus business opportunities and programs.  Qualpay provided payment processing for the defendants in *FTC v. AWS, LLC et al*, 2:18-cv-00442 (D. Nev.) until the court issued a temporary restraining order on March 14, 2018.  Qualpay provided payment processing for the defendants in *FTC v. Sellers Playbook, Inc.*, 18-cv-2207 (D. Minn.) until the court issued a temporary restraining order on July 30, 2018.

157.    Although Qualpay's risk analyst, Tina Steffen, recommended to senior management that Qualpay terminate the *AWS* and *Sellers Playbook* accounts, as she had with MOBE, Qualpay continued to process sales for these fraudulent merchants until the FTC filed lawsuits and obtained temporary restraining orders.

158.    Qualpay also provided payment processing for the defendants in *FTC v. Zurixx, LLC*, 2:19-cv-713 (D. Utah Oct. 4, 2019); *FTC v. Nudge, LLC*, 2:19-cv-867 (D. Utah Nov. 5, 2019); and *FTC v. On Point Global, LLC*, 1:19-cv-25049 (S.D. Fla. Feb. 5, 2020).

159.    Following the FTC's lawsuits against several of Qualpay's business coaching

merchants, Qualpay decided to "score" its "coaching and mentoring merchants" to reassess the risk associated with each merchant.  Some "coaching and mentoring merchants" with chargeback rates that were greater than 5% passed the review.  Qualpay's scoring process did not include reassessing the sales practices of its merchants in light of the FTC's lawsuit against MOBE.

160.    Moreover, following the FTC's lawsuit against MOBE, Qualpay did not meaningfully change its policies and procedures for assessing whether a merchant is deceiving consumers.  Craig Gass testified, "We did a good job of helping MOBE became a better merchant.  I think they are a success story based on the information I have in my file." Gass also stated that he did not have any objections to the amount of information about MOBE's business that Qualpay had collected, and "we felt confident, and I still do, that we had done everything we could in our underwriting process to determine whether they were in violation of UDAP [laws that prevent unfair or deceptive acts or practices]."

161.    Because Qualpay was satisfied with its business dealings with MOBE, Qualpay reviewed its coaching and mentoring merchants only to see "if they were selling in a similar fashion to MOBE," for example, using live seminars or selling workshops that involved future delivery.

162.    Based on Qualpay's history of processing for merchants that sell products through deceptive marketing, its continued involvement in the business of payment processing, and the ease with which Qualpay can engage in similar conduct for existing or future merchants, the Federal Trade Commission has reason to believe that Qualpay is violating or is about to violate laws enforced by the Commission.

## VIOLATIONS OF THE FTC ACT

163.     Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce." Acts or practices are unfair under Section 5 of the FTC Act if they cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid and that is not outweighed by countervailing benefits to consumers or competition.  15 U.S.C. § 45(n).

## COUNT ONE

### Unfairness

164.     In numerous instances Defendant provided payment processing services for merchants when, among other things, Defendant ignored signs indicating that the merchant was likely engaged in deceptive acts or practices.

165.     Defendant's actions cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.

166.     Therefore Defendant's acts or practices as described in Paragraph 1 constitute unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. §§ 45(a) and (n)

## CONSUMER INJURY

167.     Consumers have suffered and will continue to suffer substantial injury as a result of Defendant's violations of the FTC Act.  In addition, Defendant has been unjustly enriched as a result of its unlawful acts or practices.  Absent injunctive relief by this Court,

Defendant is likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

## THIS COURT'S POWER TO GRANT RELIEF

168.     Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to stop and redress violations of any provision of law enforced by the FTC.  The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

## PRAYER FOR RELIEF

Wherefore, Plaintiff FTC, pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), and the Court's own equitable powers, requests that the Court:

A.     Enter a permanent injunction to prevent future violations of the FTC Act by Defendant;

B.     Find Defendant jointly and severally liable for redress to all consumers who were injured as a result of their violations, as appropriate;

C.     Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendant's violations of the FTC Act, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies; and

D.     Award Plaintiff the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper.

Respectfully submitted,

ALDEN F. ABBOTT
General Counsel

Dated:  June 1, 2020                    /s/ Benjamin R. Davidson

Benjamin R. Davidson  (Trial Counsel)
Sung W. Kim (Trial Counsel)
Federal Trade Commission
600 Pennsylvania Ave., NW, Mailstop CC-8528
Washington, DC 20580
Davidson:  (202) 326-3055; bdavidson@ftc.gov
Kim:  (202) 326-2211; skim6@ftc.gov
Fax:  (202) 326-3395

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION